UNITED STATES DISTRICT COURT
*for the*
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
UNITED STATES OF AMERICA

Plaintiff,                                                    11 Cr. 548 (GBD)

v.

WILLARD LANHAM
a/k/a "Ross Lanham.

Defendant.
------------------------------------------------------------X

**SENTENCING MEMORANDUM OF WILLARD LANHAM**

This Memorandum is respectfully submitted on behalf of Willard Ross Lanham, the above-captioned defendant, after having been found guilty after trial of one count of theft of funds (18 USC 666) and three counts of mail fraud (18 USC 1341).

<u>THE PRE-SENTENCE REPORT GROSSLY OVERESTIMATES THE AMOUNT OF LOSS.</u>

The Presentence Report calculates the Sentencing Guidelines to be 70 to 87 months. This, however, grossly overestimates the amount of loss and is not consistent with the Guidelines in that it renders the total amount paid by the DOE as loss and does not allow for the fair market value of the services provided to be deducted from the overall amount charged as is warranted under USSG 2B1.1 application note 3(E).

United States v. Booker, 543 U.S. 220 (2005), holds that the Sentencing Guidelines are advisory. Thus, while the Court should calculate the applicable Guideline range pursuant to the Sentencing Guidelines, it must then consider all of the §3553(a) factors and, using these factors, make an individualized assessment based on the facts presented. *Gall v. United States*, 552 U.S. 38, 50 (2007).

This Court has broad discretion to vary from the applicable Guideline range, and "may not presume that the Guidelines range is reasonable." *Rita v. United States*, 551 U.S. 338, 351 (2007) (the district court may not presume that the advisory Guideline range is reasonable). It has "considerable discretion" to identify "the grounds that can justify a non-Guidelines sentence." *United States v. Jones*, 531 F.3d 163, 172 (2d Cir. 2008). The Court can rely on both policy disagreements with the Guidelines as well as

1

the circumstances of a particular defendant or offense. See *Spears v. United States*, -- U.S. --, 129 S. Ct. 840, 843-44 (2009). As the Second Circuit recently stated, "[s]o long as factors considered by the sentencing court are not inconsistent with those listed in § 3553(a) and are logically applied to the defendant's circumstances, we accord deference to the court's broad discretion in imposing a sentence within a statutory range." *United States v. Williams*, 524 F.3d 209, 216 (2d Cir. 2008).

Set forth below are the Guidelines calculation contained in the Presentence Report, followed, we respectfully submit, by the accurate Guideline calculation.

*The Presentence Report Calculation*

The counts of conviction were theft of funds in violation of 18 USC 666 and three counts of mail fraud in violation of 18 USC 1341. Pursuant to USSG §3D1.2(d) the counts are grouped together into a single group. The Guidelines calculation from the Presentence Report is as follows:

| | |
|---|---|
| Base offense level – Guideline § 2B1.1 – | 7 |
| $3.9 Million loss – | 18 |
| The Defendant was in a position of trust – | 2 |
| Total – | 27 |

This results in a Guidelines range of 70 to 87 months.
The following is the defendant's Guideline calculation, which not only is accurate pursuant to the Guideline language and policies, but also, unlike the Presentence Report's calculation, is consistent with the statutory considerations found in 18 U.S.C. § 3553(a).

| | |
|---|---|
| Base Offense level – | 7 |
| Guidelines 2B1.1 app. n. 3(E)(i) – | 12 |
| Defendant was in a position of trust – | 2 |
| Total – | 21 |

This calculation results in a Guideline range of 37 to 46 months. The primary difference in the Presentence Report and the correct analysis offered by the defendant is the calculation of loss.

The government bears the burden of proof on all facts underlying a sentencing enhancement pursuant to the Sentencing Guidelines. United States v. Zolp, 479 F.3d 715, 718 (9th Cir. 2007). When the government seeks a large enhancement based upon the loss table found in Guideline § 2B 1.1(b), a "clear and convincing" standard of proof applies. Id. (internal citations omitted).

Even under the advisory Guidelines regime, moreover, the Sixth Amendment may limit the extent to which a court can impose a substantial loss enhancement. See Rita, 551 U.S. at 368-75 (Scalia, J., concurring in part).

The defendant agrees with the Presentence Report that the offenses of conviction "group" pursuant to Guideline § 3D1.2(d) and 3D1.3, such that there is no multiple count enhancement, and that the base offense level pursuant to Guideline § 2B1.1(a)(1) is 7. There is, however, a substantial disagreement regarding the "loss" figure that should be used pursuant to the chart set forth in Guideline § 2B 1.1(b).

<u>THE FACTORS SET FORTH IN 18 U.S.C. § 3553(A) STRONGLY COUNSEL A LOW SENTENCE, WHICH WOULD ALLOW MR. LANHAM TO MAINTAIN FAMILY RELATIONSHIPS WITH HIS CHILDREN, BUT ALSO RETURN TO WORK AND BEGIN TO PAY BACK ANY RESTITUTION ORDERED BY THIS COURT</u>.

In fashioning an appropriate sentence, in addition to the Sentencing Guidelines, the Court must consider each of the factors set out in 18 U.S.C. § 3553(a). Gall, 552 U.S. at 39. The factors relevant under that section here include: (1) the background, history and individual characteristics of the defendant; (2) the nature and circumstances of the offense; (3) the need to protect the public from further crimes by the defendant; and (4) the need to provide adequate deterrence of others.

Taking into consideration all the factors under §3553(a) including the strong family ties that Mr. Lanham has with his children, his limited criminal history that consists of mainly youthful indiscretions, his life as a reliable member of his community, and the fact that his youngest daughter (a teenager) looks to him solely for financial and emotional support and guidance, given his ex-wife's indiscrete lifestyle – the Court must arrive at a sentence that is sufficient, but not greater than necessary to comply with the purposes of sentencing. 18 U.S.C §3553(a). A low sentence in this case would allow Mr. Lanham to maintain the close contacts he has with his children and especially with his youngest daughter, who as a teenager looks exclusively to him for support and guidance.

*Personal History and Characteristics of Willard Lanham*.

Mr. Lanham's personal history and characteristics are universally positive and demonstrate a life centered upon his family and solid community contacts. Mr. Lanham has three children Taylor, age 25, Britney, age 23 and his teenage daughter Kayla, age 16.

Because of the marital problems that Mr. Lanham has had over the past year he has been the sole provide for his teenage daughter financially and emotionally. Mr. Lanham recently went through a rather bitter divorce as his ex-wife, Laura, is going through a highly ostentatious mid-life crisis and conducts herself largely as a teenager attending night clubs and dating men in their teens and twenties. She is emotionally unstable and this behavior leaves Mr. Lanham to care for his teenage daughter financially and provide emotional stability.

*The Need To Protect The Public From Further Crimes By The Defendant*

There is no need to protect the public from further crimes of the defendant. First and foremost, as the Court is aware, this was not a violent crime and there is no danger that Mr. Lanham would cause physical harm to anyone in the future. Second, Mr. Lanham will never again work for the Department of Education or act as consultant to a government agency. His experience in this case and the amount of publicity surrounding this case including television and newspaper articles clearly prevents him from acting in that capacity at any time again in the future.

Accordingly, there is no need for a sentence where incarceration is a component as Mr. Lanham is not a threat to the public and there is no need for a jail sentence to protect the public from him.

*The Need To Provide Adequate Deterrence Of Others*

Mr. Lanham has been devastated by this case both professionally and financially. All of his properties are in foreclosure, he is unemployed and virtually penniless. Additionally, the amount of negative publicity and public humiliation that he has suffered as a result of this case where his professional and personal life were exposed to the media in the most negative light imaginable has had a strong deterrent effect. All aspects of Mr. Lanham's life have been dragged through the light of day in the mass media including his personal life and his very public divorce.

Needles to say this type of publicity would have a strong deterring effect for anyone, but especially for Mr. Lanham when his divorce and all the details of his relationship with his ex-wife became public. In this case a low sentence or no jail sentence would appropriately effectuate the requirement of 18 U.S.C. § 3553(a) that the sentence here be sufficient, but not greater than necessary.

*The Need To Provide Restitution To Any Victims Of The Offense*

An important factor in this case is the restitution to the victim. Although it is strongly contested what the precise amount of the restitution will be, it is nevertheless important that Mr. Lanham be given the opportunity to repay the amount of restitution ordered by this Court.

In this case a very low sentence or no jail sentence is consistent with the §3553(a) factor that restitution be made to the victim. Mr. Lanham has been offered employment by a company called All Seasons General Contracting where he can go back to work, begin to make the necessary payments for restitution and become a contributing member of society once again.

4

*The Need For The Sentence To Reflect The Seriousness Of The Offense And To Promote Respect For The Law And Provide Just Punishment For The Offense.*

In considering the seriousness of the offense, the defense requests that the Court take several factors into consideration. First, Mr. Lanham provided three consultants to the Department of Education all of whom performed actual work, provided a service and conferred value to the DOE. The testimony of each of these people with regard to the work that was performed (Stevenson, Tempio and Robert Lanham) was undisputed at trial. In considering just punishment for the offense in this case the fact that a valuable service was actually provided to the DOE should be considered. Second, the amount of money that the DOE saved as a result of these services was in the tens of millions of dollars; this was also undisputed at trial.

A just punishment for the offense, in light of the services provided and the value that was conferred to the DOE, should be a low sentence in order to be consistent with the factors set out in §3553(a).

THE CREDITING RULE: APPLYING THE NET ECONOMIC DEPRIVATION TO THE DEPARTMENT OF EDUCATION AND CREDITING MR. LANHAM WITH THE VALUE OF THE SERVICES RENDERED TO THE DEPARTMENT OF EDUCATION.

*The Amount Of Loss Must Be Reduced By The Fair Market Value Of The Services Rendered.*

The new economic crime guideline dictates that loss is a measurement of economic harm to the victim and therefore must be a measurement of net economic harm deprivation. Section 2B1.1 application n. 3(E)(i) states that as a general rule loss shall be reduced by the money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

Although the District Court's factual findings relating to loss must be established by a preponderance of the evidence," *United States v. Brennan*, 395 F.3d 59, 74 (2d Cir.2005), the court "need not establish the loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information.' " *U.S. v. Carboni*, 204 F.3d 39, 46 (quoting *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.1997)); see also *United States v. Canova*, 412 F.3d 331, 352 (2d Cir. 2005).

A District Court may make a reasonable estimate "by extrapolating the average amount of loss from known data and applying that average to transactions where the exact amount of loss is unknown." *United States v. Bryant*, 128 F.3d 74, 76 (2d Cir.1997); *U.S. v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009).

5

THE AMOUNT OF LOSS IS NOT THE AMOUNT OF GAIN BY DEFENDANT UNLESS THE LOSS CANNOT BE REASONABLY CALCULATED, IN THIS CASE THE LOSS CAN BE REASONABLE CALCULATED AND THE PROFIT IS AN INAPPROPRIATE MEASURE OF LOSS.

The court shall use the gain that resulted from the offense as an *alternative* measure of loss only if there is a loss but it reasonable cannot be determined. *U.S. v. Zangari*, 677 F.3d 86 (2d Cir. 2012) quoting USSG § 2B1.1 application n. 3(B); See also *U.S. v. Zafar*, 291 Fed.Appx. 425, 429 (2d Cir. 2008) The amount of defendant's gain is an alternate measure of loss only if it reasonably cannot be determined.

In this case the amounts of loss can be reasonably calculated by way of government exhibits 101 through 136 testimony at trial. Therefore, it would be inappropriate to equate losses with the gain or profit of the defendant in this case.

The probation report asserts that the DOE incurred losses of approximately $3.9 million and that restitution is owed to the DOE in the amount of $3.9 million. Mr. Lanham disputes that the losses to the DOE were $3.9 million because at trial Valerie Batista testified to this amount being the total amount billed to the DOE by Verizon. Based on the billing examples and exhibits used by Batista during her testimony, $3.9 million is overstated by $864,597.52. Each of Batista's billing examples for the consultants confirmed a subcontractor markup of 10% and the markups by Verizon. After a review of government exhibits 101 through 136, the total amount billed to the DOE by Verizon for Stevenson, Tempio and Robert Lanham would need to be reduced from $3.9 million to $3,144,875.75. The Verizon profit is $599,021.83

Batista's example for **Tamika Stevenson** – Trial Transcript pgs. 432 – 440
| | |
|---|---|
| Lanham invoice (5/2005) to CDC, Verizon sub | $37,125.00 |
| CDC Invoice to CCS Verizon sub, | $40,837.50 (10%) |
| CCS Invoice to Verizon(passthrough only, no markup) | $40,837.50 |
| Verizon Invoice to DOE | $49,824.75 |
| Verizon Profit | $8,987.25 (22%) |

Batista's example for **Karen Tempio** – Trial Transcript pgs. 443 - 446
| | |
|---|---|
| Lanham invoice (1/2008) to CDC, Verizon sub | $57,037.50 |
| CDC Invoice to Verizon | $62,741.25 (10%) |
| Verizon Invoice to DOE | $73,813.24 |
| Verizon Profit | $11,071.99 (17.65%) |

Batista's example for **Robert Lanham** – Trial Transcripts pgs. 447 - 450
| | |
|---|---|
| Lanham invoice (2/2007) to CDC, Verizon sub | $53,862.50 |
| CDC Invoice to Verizon | $59,248.25 (10%) |
| Verizon Invoice to DOE | $75,969.93 |
| Verizon Profit | $16,721.18 (28.22%) |

| | |
|---|---|
| Total Billed to the DOE by Verizon | **$3,144,875.75** |
| Verizon sub-contractor, CDC, mark-up at 10% | $ 231,441.27 |
| Verizon mark-up | $ 599,021.83 |

The figures as stated above are taken from government exhibits 101 through 136. The amount as calculated here as the total amount billed to the DOE by Verizon represents a summary of the actual Verizon invoices submitted to the DOE for Stevenson, Tempio and Robert Lanham.

The total figure billed to the DOE, based on the Government exhibits is $3,144,875.75.

*The Department of Education Authorized Mr. Lanham To Hire Up To Five Employees For The Telecommunications Project.*

The Department of Education authorized Mr. Lanham to hire up to five employees for the Telecommunications project when a DOE employee signed the Accenture Project Book. All three of these employees were part of the Accenture staffing plan (See GX 607) that was signed and accepted by the DOE (See Trial Transcript pgs. 592-593) and the Accenture Book.

It is the understanding of the defense that the Government's position is that these employees were not requested or wanted and so no fair market value should be assigned to them. Nothing could be further from the truth. These employees were part of the staffing of the Accenture plan and that plan envisioned five additional employees working for Mr. Lanham and that plan was signed by a high ranking member of the DOE.

Therefore, Stevenson, Tempio and Lanham were all working as part of the Accenture Plan and their positions were approved by the DOE. The Government's argument that the DOE never wanted these people and therefore no fair market value should be assigned to their services is without merit.

*The Fair Market Value Of The Services Provided Must Be Deducted From The Calculated Loss*.

Under the Sentencing Guidelines §2B1.1 Application Notes 3(E)(i) *Loss shall be reduced by the following: the money returned, and the fair market value of the property returned and the services rendered by the defendant or other person acting jointly with the defendant*. Therefore, loss calculated in the total amount of what Verizon billed to the DOE is inappropriate.

The total loss can not be equated with the total paid by the DOE to Verizon because that would mean that the services provided by Mr. Lanham and the consultants would have zero worth. The precise value of the services provided by Mr. Lanham and the three consultants may be disputed, but those services cannot be valued at zero. The amount of loss must be reduced by the fair market value of those services to the DOE.

There are numerous methods of calculating the fair market value of a service or of a thing taken. The majority of Courts have held that the term fair market value does not refer to a uniform measure of loss, but must be interpreted according to the circumstances of the case. Thus, the market value is its value in the market in which it was being traded at the time of the offense.

The Second Circuit has held that a sentencing Court's estimated loss was reasonable supported by a preponderance of the evidence where the court used a general point of reference for fraudulent transactions, even if not based on precise data, but was data that was reasonably known. *U.S. v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009).

The First Circuit has held that the fair market value of goods should reflect the market in which the victim merchant would have sold them. *U.S. v. Stoupis*, 530 F.3d 82, 85-86 (1st Cir. 2008). The Sixth Circuit has held that the standard test for determining fair market value is to look at the price a willing buyer would pay a willing seller at the time and place the property was stolen. *U.S. v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005)

The value of the services provided by the consultants and reasonable mark up fees by both Verizon and Mr. Lanham (or any other sub-contractor) must be deducted from DOE's total loss because those are the fees that the DOE would have paid in any case if anyone were providing those services. Any assumption that the value of the services provided was zero would result in a total windfall to the DOE and would assume that there were no services provided at all or no value conferred to the DOE by those services. This simply is not true and the Application Notes of the Guidelines, as outlined above, militate that the amount of loss be reduced by the fair market value of the services provided.

The Guidelines provide for a credit against loss where the victim of the fraud receives value. The loss amount is reduced by "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." USSG § 2B1.1 cmt. n.3(E). *U.S. v. Geeslin*, 447 F.3d 408 (5th Cir. 2006).

The Second Circuit recently decided the case of *U.S. v. Zangari*, 677 F.3d 86 (2d Cir. 2012). In that case the Court held that a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss. Although the Court made the distinction between calculating restitution, in that case, and calculating loss for sentencing purpose, as in this case, the Court's holding is instructive here. The *Zangari* court found that there are several methods of calculating loss such as requiring additional documentation or hearing testimony, allowing additional time for a final determination of the victim's losses, etc.

In this case the testimony of Ms. Batista and government exhibits 101 through 136 gave precise figures of what the three individuals were paid and what the mark ups were of Verizon, the sub-contractors CDC and Lanham Enterprises. A fair market value must be assigned to each of these in order to calculate the loss to the DOE because it was

undisputed that the three consultants Stevenson, Tempio and Robert Lanham actually performed work for the DOE and did confer value to the DOE through their services.

Thus, if the correct amount of $3,144,875.75 is used for total billing from Verizon to the DOE and then subtract the amount paid to the three consultants, totaling $625,480.25, leaving a total figure of $2,519,395.50. Then the markups by both Verizon and the subcontractors must be deducted. Verizon's mark up was $599,021.83 and the mark up of the sub-contractor was $231,441.27. When these amounts are deducted this leaves a total figure of $1,688,932.40.

Finally, the fair market value of what the DOE would have paid to any other sub-contractor other than Lanham Enterprises must be applied and subtracted from the total amount paid by the DOE. The rates that Mr. Lanham charged, as evidenced at trial, were $225 per hour for both Stevenson and Tempio and $175 per hour for Robert Lanham.

The fair market rates for the mark ups on these services were evidenced at trial and in the Rule 29/33 motion later made to the Court. At trial evidence of the hourly rate paid to sub-contractors for similar skill positions prior to the IBM mark up ranged from $1,000.00 per day or $125 per hour for an eight hour day, to $1,500.00 per day or $187.50 per hour for an eight hour day. These rates come from the testimony of Monica Duffy an employee of IBM (pgs. 515-517).

Under the Verizon contract rates paid to similarly skilled employees come from the New York State Office of General Services, which was included as Exhibit A in the Rule 29/33 motion to the Court. The hourly rates for analysts ranges from $177.09 per hour to $246.71 per hour.

Applying the lowest rate of $125 per hour for all the hours worked by Stevenson, Tempio and Robert Lanham, and using that as a fair market markup for a sub-contractor, that amounts to $673,446.00. Using the middle rate of IBM of 187.50 per hour, the fair market mark up for all hours worked by Stevenson, Tempio and Robert Lanham would be $1,317,386.63. Using the high rate as per New York State OGS of $246.71 per hour, the fair market mark up for all hours worked by Stevenson, Tempio and Robert Lanham is $1,927,430.22.

Thus the fair market value of the services provided by Lanham Enterprises has a range of $673,446 using the lowest possible rate; or $1,317,386.63 using the middle rate; or $1,927,430.22 using the highest rate. Deducting these fair market values from the total profit of Lanham Enterprises yields these figures:

Using the lowest rate: $1,688,932.40- $673,446.00 = adjusted loss of $1,015,486.40
Using the middle rate: $1,688,932.40- $1,317,386.63 = adjusted loss of $371,545.77
Using highest rate: $1,688,932.40- $1,927,430.22 = a gain of $238,497.82

*A Middle Or Median Calculation Of Loss Should Be Used To Render The Appropriate Loss And Hence The Appropriate Offense Level In This Case*.

The pre-sentence report calculates the offense level at 27 with a base offense level of 7 and increasing the offense level by 18 points because the loss to the DOE was calculated at $3.9 million.

The defense position is that the loss to the DOE was much less than $3.9 million and the offense level should not be increased by 18 points. The offense level, as per the calculations above can range from an increase to zero points (using the highest hourly rate as a fair market value) to an increase of 12 offense level points (using the middle rate as a fair market value) to an increase of 14 points using the lowest hourly rate as a fair market value).

It is the defense's position that Mr. Lanham charged $225 per hour for Stevenson and Tempio and $175 per hour for Robert Lanham and that this was below the highest rate, but slightly above the middle rate. As it was at all times below the highest fair market hourly rate it would be unjust to increase the offense level by 14 points because that would be imposing the maximum allowable points based on a fair market value, which Mr. Lanham never charged.

Mr. Lanham's actual profits were $1,688,932.40, which when applying the middle fair market rate from IBM of $187.50 per hour or a total of $1,317,386.63 as a fair market value for the service leaves an adjusted loss of $371,545.77 or an increase of 12 offense level points and a total offense level of 21 points.

*<u>There Are No Lawsuits Pending With Mr. Lanham's Ex-Wife As They Have All Been Settled Or Dismissed.</u>*

In paragraphs 66-67 of the pre-sentence investigation report it is asserted that certain law suits are pending and that Mr. Lanham profited $100,000 from the sale of property in 2010. All of this is untrue as those suits were part of the divorce proceedings, which have concluded, the civil suits dismissed and the property in question was never sold at a profit of $100,000.

*<u>Mr. Lanham Did Not Make False Statements At Trial And No Additional Offense Level Points Should Be Added</u>*.

In paragraph 30 of the pre-sentence report it asserts that the Government's position is that Mr. Lanham made false statements at trial and leaves to the discretion of the trial court any additional offense level points to be added.

The defense's position is that Mr. Lanham did not make false statements at trial and that no offense level points should be added.

## REQUEST FOR FATICO HEARING AS TO THE AMOUNT OF LOSS AND THE AMOUNT OF RESTITUTION.

It is the understanding of the defense that the United States District Attorney has a different opinion of the amount of loss and the amount of restitution. It is also the understanding of the defense that the District Attorney does not believe that any fair market value should be applied when calculating the amount of loss or the amount of restitution. It is therefore the request of the defense that a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) be held in order to determine the correct amount of loss and the correct amount of restitution.

## RESTITUTION MUST BE CONSISTENT WITH THE AMOUNT OF LOSS AS PREVIOUSLY CALCULATED

In deciding the amount of restitution, the Government bears the burden of proving the amount of loss by a preponderance of the evidence. 18 U.S.C. 3664(e). Restitution in this case must be paid pursuant to 18 U.S.C. §3663A and is mandatory and the order of restitution shall be issued and enforced in accordance with § 3664.

Pursuant to 18 U.S.C. § 3664(d)(4) the Court, after reviewing the probation officer's report, may require additional documentation or hear testimony. It is the understanding of the defense that the amount of loss and the amount of restitution is in dispute as the District Attorney asserts that the amount of restitution should be equated with the amount of profit made by the defendant.

The Second Circuit recently decided *U.S. v. Zangari*, 677 F.3d 86, which held that the defendant's gain may only be used as an alternative measure of loss and restitution and that a court ordering restitution may not substitute a defendant's ill-gotten gains for the victim's actual loss.

It is requested that a hearing be held so that the prosecution can fulfill its burden of proving by a preponderance of the evidence what the amount of loss and restitution should be.

Dated: July 20, 2012
New York, New York

STEPHEN N. PREZIOSI, ESQ.
570 Seventh Ave., 6th Floor
New York, New York 10018
212.300.3845